IN

# THE SUPREME COURT

OF

## PENNSYLVANIA.

---

### WESTERN DISTRICT—PITTSBURGH 1862.

---

## Ewing *versus* Thompson.

*Power of Executive to revoke Commission regularly issued.—Return,
prim\u00e2 facie Proof of Election.—Certiorari may be granted on Terms.
— When a supersedeas in case of Contested Election.—Injunction,
when granted in such cases.*

1. The governor of the state has no power to revoke a commission once
regularly issued to an officer who is not removable at his pleasure, whether
the appointing power be in the governor or elsewhere.

2. Where the appointing power is in electors, the governor has no choice
but to commission the person elected, and that done, a vested right is consum-
mated in the appointee which nothing but judicial decision can take away or
authorize him to recall.

3. The law has made the return the only evidence of an election, in the
first instance, and conclusive until it has been corrected, or shown to be false,
by a judicial determination.

4. A common law writ of *certiorari*, whether issued before or after judgment,
is in effect, a *supersedeas*, but the power of the tribunal to which the writ is
directed, is only suspended by it.

5. In an election contest, the judicial proceeding terminating with the judg-
ment or decree, nothing remains, so far as the court below is concerned, to be
stayed by a *certiorari*.

6. Whether the service of a *certiorari* on the court takes away from the
executive, the power to issue a new commission, in view of a decree correcting
election returns, not decided. His action would not be disobedience to the
writ, for that goes only to the judges.

7. But the writ stays the action of the party afterwards receiving the new
commission issued in accordance with the decree. His title to his commission
is not taken away, but his right to proceed under it is suspended until the
final decision under the revisory writ.

8. A reversal of the decree leaves the original return and commission in

(372)

[Ewing v. Thompson.]

full force. An affirmance establishes the right to act under the new commission and to receive the emoluments of the office from its date.

9. A party holding such new commission as sheriff attempting to interfere with the office, before a decision on the *certiorari*, will be restrained by injunction.

10. A *certiorari* is not a writ of right, and will not be allowed for merely technical errors not affecting the merits. The court may, therefore, impose terms upon its allowance, and may revise the *allocatur* and quash the writ, if there do not appear to be sufficient grounds for it. But if allowed there is no power to compel a hearing on it before the return day of the writ.

THIS was a bill in equity filed by Robert Ewing in the Eastern District, on a motion for a special injunction before WOODWARD, J., at Nisi Prius. Unable to hear the case at Philadelphia, in consequence of the commencement of the October term in the Western District, the application was continued to October 29th 1862, when it was heard before a full bench at Pittsburgh.

The complainant had been commissioned by the governor, November 27th 1861, as sheriff of the city and county of Philadelphia. Before the issuing of this commission, his election to that office had been contested by a petition filed in the Court of Quarter Sessions of Philadelphia, which court, on the 18th day of October 1862, decided in favour of the contestant, and that John Thompson had been duly elected to the office. Mr. Ewing thereupon sued out and served a writ of *certiorari* to remove the proceedings in the contested election case into this court.

Pending the *certiorari*, Mr. Thompson applied to the governor for and obtained his commission as sheriff, and on attempting to take possession of the sheriff's office, this bill was filed praying for an injunction to restrain him from doing so, &c. Affidavits were read on both sides.

J. E. *Gowen*, for complainant, argued that the *certiorari* operated as a *supersedeas*; that the governor could not lawfully commission Mr. Thompson until the *certiorari* was disposed of; that the second commission was therefore a nullity, and that the defendant should be restrained from acting under it: citing 1 Dutcher 354; 14 Barbour 72; 22 Id. 72.

F. C. *Brewster*, for defendant, contended, 1. That the complainant's commission was void; that, according to the affidavits and election return, the commission had been issued upon the count of the army vote, which had been received under a law declared by this court to be unconstitutional.

A minority candidate is not elected, although so proclaimed and commissioned, the authority being derived from the people, and not from the certificate of election officers nor the commission of the governor: State v. Johnson, 17 Ark. Rep. 407.

[Ewing *v.* Thompson.]

2. That the court would not decide the question of title to a public office upon a motion for an injunction.

3. That the complainant had no standing in a court of equity, the decision of the contested election case being against him, and being final on the merits.

On these points he cited Commonwealth *v.* Nathans, 5 Barr 125; Carpenter's Case, 2 Harris 486; Commonwealth *v.* Garrigues, 4 Casey 9; Commonwealth *v.* Baxter, 11 Id.; Berger *v.* Smull, 3 Wright 302; Overseers *v.* Brown, 11 Harris 389; State *v.* Stewart, 5·Stroble 29; Payfer *v.* Bissell, 3 Hill; and Act of July 2d 1839 (Brightly's Digest 392, § 185).

*M. Russell Thayer*, for defendant, argued that the governor had the right to revoke the complainant's commission.

*C. Gilpin*, for defendant, objected to the motion that the *certiorari* could not interfere with the defendant's commission.

*William L. Hirst*, for complainant, contended that this was an attempt to evade the effect of the *certiorari*. He cited Marbury *v.* Madison, 1 Cranch 137.

The opinion of the court was delivered, November 1st 1862, by STRONG, J.—Three prominent questions are raised by this motion. They are, Has the complainant a legal right to the office of sheriff of the city and county of Philadelphia? Does the defendant unlawfully invade or threaten to invade that right? If he does, is the invasion of such a character as to call for the exercise by this court of its preventive power?

On the 27th day of November 1861, the governor of the Commonwealth issued a commission to the complainant, reciting that by the election returns of the October election of that year, it appeared that he had been chosen sheriff of the city and county of Philadelphia, and authorizing him to perform the duties and enjoy the privileges of said office for the term of three years, from the second Tuesday of October 1861, if he should so long behave himself well, and until his successor should be duly qualified. Under this commission he entered upon the duties of the office, and he has, in fact, acted hitherto as sheriff. If this commission is still in force, beyond controversy, he has a legal right, not only to the office, but to its undisturbed enjoyment. This we do not understand to be controverted. The next stage in the inquiry therefore is, whether anything appears which invalidates the commission. The defendant produces a commission from the governor to himself, dated October 21st 1862, reciting that it appeared from the returns of the same election, held in October 1861, that he had been chosen sheriff of the said city

[Ewing v. Thompson.]

and county, and authorizing him to hold, exercise, and enjoy the said office of sheriff, with all its rights, fees, perquisites, emoluments, and advantages, and to perform all its duties for the term of three years, to be computed from the second Tuesday of October 1861, if he should so long behave himself well, and until his successor should be duly qualified. The two commissions are for the same office, for the same term, and both recite the same election returns. The second does not profess to be founded upon any amended return; it makes no allusion to any contest of the election, and it does not in terms revoke, annul, or supersede the commission previously issued to the complainant. What then is its legal effect?

Had there been no contest of the election of sheriff, or of the election returns, it could not be maintained that the commission issued in October 1862 annulled, vacated, or superseded the commission given to the complainant in November 1861. The power of the governor to revoke a commission once issued to an officer not removable at the pleasure of the governor, may well be denied. Even where he has the power of appointment of such an officer, an appointment once made is irrevocable. Much more, it would seem, is a commission issued by him incapable of being recalled or invalidated by himself, when the appointing power is located elsewhere, and when his act, in issuing the commission, is not discretionary with him, but is only the performance of a ministerial duty. Under the Constitution, the governor does not appoint a sheriff, and he has no choice as to whom he will commission. The appointment is made by the electors, and it is the duty of the chief executive to commission the person whom they have designated according to the forms of law. When he has done that, his duty is performed, and a vested right is consummated in the person commissioned, a right which nothing but judicial decision can take away or authorize him to recall. The observations of the Supreme Court of the United States in Marbury v. Madison, 1 Cranch 137, bear forcibly upon this subject. That was an application for a *mandamus*, to compel the delivery of a commission for an office to which the applicant had been appointed by the President of the United States, and for which a commission had been made out, but not delivered. The office was one which the law created, and of which it fixed the duration of tenure by the officer, but under the Constitution the President had the appointing power. Chief Justice Marshall, in delivering the unanimous opinion of the court, made the following observations: " Where an officer is removable at the will of the executive, the circumstance which completes his appointment is of no concern, because the act is at any time revocable, and the commission may be arrested if still in the office. But where an officer is not removable at the will of the executive, the

[Ewing *v.* Thompson.

appointment is not revocable, and cannot be annulled. It has conferred legal rights which cannot be resumed. The discretion of the executive is to be exercised until the appointment has been made. But having once made the appointment, his power over the office is terminated in all cases, where, by the law, the officer is not removable by him. The right to the office is then in the person appointed, and he has the absolute unconditional power of accepting or rejecting it." In this case it seems to have been held, that neither the appointment nor the commission can be withdrawn. The executive may undoubtedly be authorized by law to revoke a commission or supersede it for cause, though he has not the power of appointment, and though the duration of the tenure may be determined by the legislature. Whether he could, when the tenure as well as the mode of appointment is defined by the Constitution, is perhaps not so clear, unless the commission has issued to one who was not elected or appointed. But the law has made the return the only evidence of an election, in the first instance, and conclusive until it has been corrected or shown to be false by a judicial determination. The defendant cannot stand therefore on his commission alone. He is compelled to show that the executive was authorized to issue it, before he can contend successfully that it has superseded that previously granted to the complainant.

This brings us to inquire whether the proceedings which have taken place in the Court of Quarter Sessions empowered the governor to grant the commission, and thereby supersede that which was issued upon the original election return. These proceedings are not referred to in the second commission, but if they conferred a power, the commission must be held to have issued under it, rather than to be void. Prior to the date of his commission, a contest of the complainant's election and of the return thereof had been initiated in the Court of Quarter Sessions under the provisions of the Act of Assembly of July 2d 1839, and in that contest a decree was entered on the 18th day of October 1862, that the complainant was not elected, but that the defendant had received a majority of the votes given, and that he was duly elected. On the same day, a *certiorari* was sued out of this court by the complainant to remove the record of the contest in the Court of Quarter Sessions, and it was served. The effect of that writ was to stay further proceedings in the court below, and to remove the record of the case into this court. That such is the effect of a *certiorari*, except in cases where the legislature has made a different rule, is the doctrine of all the cases. It is not itself a writ of *supersedeas*, but it operates as one by implication. Originally in fact, and now always in theory, at least, it takes the record out of the custody of the inferior court, and leaves nothing there to be prosecuted or enforced by execution.

Very many of the English as well as the American authorities are collected in Patchin v. The Mayor of Brooklyn, 13 Wend. 664. There are very many others, all holding a common law writ of *certiorari*, whether issued before or after judgment, to be, in effect, a *supersedeas*. There are none to the contrary. In some of them it is ruled, that action by the inferior court after the service of the writ, is erroneous; in others it is said to be void, and punishable as a contempt. They all, however, assert no more than that the power of the tribunal to which the writ is directed is suspended by it; that the judicial proceeding can progress no farther in the lower court. It is not so clear, either in reason or in authority, that collateral action is erroneous or void. If an execution has been issued upon a judgment before the service of a *certiorari*, the power of the sheriff to go on under the execution is not suspended. It requires a formal *supersedeas* to suspend it. The court may even issue a *vend. ex.* to enable its completion. An execution issued after *certiorari* served, is erroneous, and perhaps void, because its issue is the act of the court to which the superior writ has been sent, and of the party whose further proceeding has been stayed. An election contest is in some respects peculiar. True, it is a judicial proceeding, but, so far as the court in which it is conducted is concerned, it terminates with the judgment or decree. No execution of the decree is intrusted to the court, or is under its control. When the truth of the return is contested, the duty of the court is to ascertain what should have been the true return, and declare it. Then its duty has been done. The regularity of its proceeding may be revised in the superior court, and no doubt a *certiorari* removes the record in such a case. It cannot, however, operate upon the inferior court as a *supersedeas*, for after a decree there is no possible action of that court to be stayed. If it stays anything, it can only be the action of the executive in issuing a new commission in view of it, rather than upon it, or action under the new commission when issued by the substantial party to the decree in whose favour it has been made. But the issue of a commission by the executive after the service of a *certiorari* is not disobedience to the writ, for that goes only to the judges. It is not therefore a contempt, as action by the judges and the parties would be. He is no party to the contest, either in form or in substance. In reason, therefore, there is an obvious difference between the effect of a *certiorari* upon the court to which it is sent, or the parties to the judicial proceeeding removed, and the executive, who has no connection with the record. Nor do the authorities show that a *certiorari* operates upon any other than the court and parties. We are therefore not prepared to hold that, on the 21st day of October 1862, after the decree declaring what was the true result of the election had been made in the

Court of Quarter Sessions, the executive had not authority to issue a commission to the defendant. Especially are we not prepared so to rule upon this motion, which is an appeal to our judicial discretion, while we are sitting only at Nisi Prius. The commission of the defendant is not necessarily invalid because the election contest is still pending in the sense in which a cause adjudicated in an inferior court is said to be pending after its removal by *certiorari* or writ of error to a court which is superior. Had it issued one day before the service of the *certiorari*, but after the decree of the Court of Quarter Sessions, and had the officer commenced his duties, no one will contend that it would have been avoided or interrupted by the mere subsequent service of the writ, any more than an execution partly executed is stayed by the service of a *certiorari* on the court which had awarded it. And yet had the *certiorari* sued out by the complainant been four days later than it was, the election contest would be a pending proceeding, just as truly as it now is. A *certiorari* after judgment, like a writ of error, is, in fact, a new suit. It enables him who obtains it to aver errors in the record removed, not to retry the facts in this court. A judgment in it may, indeed, be followed by a new trial in the lower court, but there is no retrial here. It is not on that account, not because the action may, in this sense, be said to be pending, that proceedings are stayed in the court where the trial was held, but it is because in contemplation of law its record is removed to another tribunal.

But, while we do not hold that the *certiorari* served on the court, took away from the executive the power to issue the commission to the defendant after the decree correcting the election returns, a power which the decree unimpeached gave him, we do hold that the service of the writ affects the defendant. He was a party to the contest in the Quarter Sessions, not in name, but in substantial truth. It was his right which was in controversy, and his were the fruits of the decree. Upon him, therefore, the *certiorari* may operate. When it was served, and the record was removed, he had not begun to execute the duties of the office or to act under the decree and his commission. His position is like that of a party who has an execution in his hands not delivered to the officer when the writ comes, and stays his further proceeding. His title to his commission is not taken away, but his right to proceed under it is suspended until the final decision under the revisory writ. It may be that the decision of the Supreme Court on the hearing of the *certiorari*, will result in setting aside the decree of the Court of Quarter Sessions, and thus leave the original return and the commission of the complainant in full force. On the other hand, if the decree be affirmed, the right of the defendant to his commission, and to the emoluments of the office from the 21st day of October last, will be established.

[Ewing v. Thompson.]

His title will then have commenced at the date of his commission. It does not, however, give him a present right to assume the office or interfere with its duties.

The second question is easily answered in the affirmative. The bill and affidavits show that there has been, and still is, a disturbance of the rights of the complainant made by the defendant, no doubt under a belief of right, but still unlawful.

The remaining inquiry is, whether the case is such a one as requires the court, in the exercise of its equity powers, to grant an injunction. It is a bill preferred by an individual, asserting a personal right invaded. Yet it is not to be overlooked that it affects public interests. The office of sheriff is a most important one, and the question, which of two persons claiming it may lawfully perform its duties, is one in which the whole community is interested. We ought not to leave the matter in doubt. Though we cannot now determine finally who has the right, we can and ought to determine who is the sheriff in fact, and prevent a conflict until there shall be an adjudication that shall terminate finally the election contest. We therefore feel constrained to award an injunction.

A speedy final decision of the contested election is imperatively demanded by public considerations. In the light of these, individual interests and personal convenience are of minor importance, though they are by no means to be disregarded. We have no power to compel a hearing on the *certiorari* before the return day of the writ. But we have power to dissolve the injunction now granted, and we have power to impose terms upon the allowance of a common law writ of *certiorari* after judgment. It is not a writ of right, and will never be allowed for merely technical errors which do not affect the merits : Bac. Ab., *Certiorari*, A. We will use some of these powers unless the parties agree in writing to a hearing on the writ of *certiorari* before the Supreme Court in *banc* at Pittsburgh, on the 15th day of November 1862. We cannot treat the writ as not allowed, but we can revise the *allocatur* and quash the writ, if there do not appear to be sufficient grounds for it.

> And now, to wit, November 1st 1862, this motion came on for hearing before the Supreme Court at *nisi prius*, and was argued by counsel. Whereupon, after due consideration, it is ordered, adjudged, and decreed that, on the complainants giving security according to the Act of Assembly in the sum of $5000, the said John Thompson, his agents and servants, be enjoined from interfering or intermeddling with the office of sheriff of the city and county of Philadelphia, or from disturbing or molesting the complainant in the peaceable possession and enjoyment thereof,

[Ewing *v.* Thompson.]

until final hearing of a certain writ of *certiorari* sued out of the Supreme Court to remove the record of a contested election between the complainant and defendant, or until further order.

And it is further ordered that the defendant have leave to move the court, on the 15th day of November 1862, to quash the *certiorari*, for having been issued without special cause previously shown, unless the plaintiff shall then show sufficient cause on giving five days' notice.

The following concurring opinion was delivered, November 5th 1862, by

WOODWARD, J.—The governor has no power to revoke a sheriff's commission. The only appointing power in respect to sheriffs which he possesses is to fill vacancies which occur during an official term. Formerly he had more. Under the Constitution of 1770, the electors returned two names to the governor, and he was empowered to appoint either. But the Constitution of 1838 provided for the election by the people of one person only for the office of sheriff, in each county; and he "shall be commissioned by the governor," says the Constitution. No discretion or right of choice is committed to the governor. The rule of the Constitution is imperative that he shall appoint whom the people elect. And where a doubt or dispute exists as to who is elected, the law commits the question to the judicial tribunals, and to them the governor is to look for a decision that shall be final and binding on all citizens. The executive commission is not the title to the office—it is only a ministerial authentication of the title which the electors have conferred. Prothonotaries and clerks of the courts, registers, recorders, justices of the peace, and aldermen are also commissioned by the governor, though elected, like sheriffs, by the people. The reason why the Constitution of 1838 continued the executive power to commission, after it had taken away the executive power to appoint these officers, was that there might be a public record, accessible to everybody, of the official existence and powers of the persons named. It is often necessary in after years to show who filled a particular office at a particular time, and the Constitution meant to place a permanent memorial of the fact in the archives of the executive department. Hence the power to commission officers, with whose selection or appointment the governor has no more to do than any other citizen entitled to a vote. And having no power of appointment, he has no power to revoke or impair a commission once granted. If it have been unduly granted to one man when it ought to have gone to another, it is to be set aside and avoided only by judicial process. And when the

[Ewing v. Thompson.]

governor is certified of the final result of such judicial process, it becomes his duty to grant the commission which ought to have been issued in the first instance.

If, therefore, we ignore the judicial proceedings had between these parties, as both of the executive commissions did ignore them, it results necessarily out of the constitutional functions of the governor that his last commission could not revoke, supersede, or in any wise impair the first. And it is very important to assert this conclusion with distinctness, that it may not, on some future ·occasion, come to be thought that a governor may supersede the commissions granted by himself the year before, or that an incoming governor may supersede all of the existing commissions issued by his predecessor.

But we have no right to ignore the judicial proceedings had in the Quarter Sessions of Philadelphia, for they are referred to in the bill, answer, and proofs. What was their nature and effect? They were proceedings for contesting the sheriff's election of 1861, and they resulted, on the 18th of October 1862, in a decree in favour of the present respondent. On the same day, the plaintiff obtained, served, and filed a writ of *certiorari* to that decree. If, on the 21st of October (the date of the commission to Thompson), the governor had that record before him, he saw that the appropriate writ to bring that record under review in the Supreme Court was pending, and that the question who of these two men had been legally elected was not yet finally decided. If he had not the record before him, it was the fault of the parties to permit him to issue a second commission in ignorance of the *certiorari*, and we have seen already that a commission so issued impaired not the prior commission. But if the governor was informed of · the writ of *certiorari*, had he a right to disregard it? My firm conviction is, that he had not; that he was just as much bound to respect it as every other citizen of the Commonwealth.

I have said it was the appropriate writ for the occasion. Ewing had a right to take it. He had no right to take it for the delay of justice, but he swore solemnly that it was not taken for purposes of delay, and this entitled him to it. We said so in Miller *v.* Chase, and I have no disposition to qualify the ruling in that case. The counsel for the respondent have taken no exception to the writ, have not moved to quash it, either for want of an *allocatur* or for other causes. In such circumstances, it seems to me that it is not our duty to suggest difficulties about the writ, and to threaten to quash it before the return day. And certainly I cannot say that the governor was at liberty to disregard it, and to issue a commission to become good and valid, if that writ should happen to be quashed, or to be decided against Ewing. He either had the power, and it was his duty, to commission

Thompson at the time he did, or he had not the power, and it was not his duty. I hold that until the judicial proceeding was finally terminated, neither the power nor the duty attached.

A writ of *certiorari* is not a writ of *supersedeas ;* it is what its name imports, a writ commanding an inferior judicial tribunal to certify its record into the appellate tribunal, that the latter court may be made sure that no errors in law appear on the record. If the inferior court have issued an execution upon a judgment before the *certiorari* comes to them, they supersede it, as was done in the memorable case of The Commonwealth *v.* The Pennsylvania Central Railroad Company, 3 Wr. 406. But if the judgment or decree of the inferior court is to be followed by no execution issued out of that court, no *supersedeas* is necessary. And such was this case. The Quarter Sessions had issued no execution, and the law authorized none. They had finished their work when they pronounced the decree. The *certiorari* removed it into the Supreme Court to be reviewed, and there it hangs still. But the legal effect of the removal was to suspend all claim and all action under the decree. As in a capital case, where the court which pronounces the judgment issues no execution, but the governor does, will it be said that notwithstanding a writ of error or *certiorari* duly issued out of the superior court, and undecided, the governor may go on and hang the culprit? Or in a road case where the supervisor is the executive officer, and acts upon a certified copy of the decree of the Quarter Sessions, may he proceed in disregard of a *certiorari* duly issued and served? There are many cases under our Poor Laws and School Laws where the court does not execute its own decrees, but has it ever been contended that after the record has been removed to be reviewed in an appellate court, the executive officer may go on and execute it as if no review had been instituted? I am not aware of any decisions of this court, or of any other, that would justify an affirmative answer of these questions. Not that the writ is addressed to the executive officer so as to put him in contempt for disobeying it, nor that it is in form a *supersedeas,* but the ground on which it exacts suspension of all official execution is that respect and obedience which the law demands of all law officers for all legal process. No officer is higher than the law. And when the law has instituted a review of a judicial record, all parties claiming rights under it must wait the course of the law. And executive officers too must wait. It is quite beside the point to consider what would have been the effect of. an executive commission granted *before* the *certiorari* issued. That is not the question on the record, and therefore I shall not discuss it. The commission in question was issued two days *after* the *certiorari* was duly served, and before it was judicially disposed of, and therefore it was premature and unauthorized by law.

[Ewing *v.* Thompson.]

The governor had no right to offer Thompson a commission before the writ was disposed of, and Thompson had no right to accept it.

This disposes of the only question upon the record now before us. What there is in the record brought up by the *certiorari* I know not, for it has not been opened to us. When its turn comes, it shall have justice according to law. Meanwhile, our present duty is accomplished by declaring that Ewing holds the office of sheriff under an executive commission of 1861, which was not superseded by the commission issued to Thompson in 1862, and therefore Ewing is entitled to retain the office until, in the language of his commission, his successor has been " duly qualified."

I have been, and still am, most anxious for the speedy disposition of this contested election, and therefore I consent to fix a day for the argument of the *certiorari* before the term at which it is returnable. But it can be argued then only by consent of counsel. I have no doubt they will do their utmost to facilitate the argument and to speed justice; but if they should not consent to an argument on the day fixed, I do not think that, at present, they ought to be threatened with disagreeable consequences.

Nor am I prepared to decide now, that Thompson's commission, if the *certiorari* be finally decided in his favour, will entitle him to the emoluments of the office from its date. How a mere ministerial authentication issued before the fact occurs which it is intended to authenticate, and enjoined against for that reason, can confer any rights, and especially the right to receive the emoluments of an office legally exercised by another, is not apparent to me. Nor do I think the time has arrived for deciding that question. On the whole, I am of opinion that on the plaintiff's giving security in $5000, the injunction should issue, and that the 15th November instant be fixed for the argument of the *certiorari* by consent of counsel.

On the 15th November 1862, *F. C. Brewster* moved the court to dissolve this injunction, and quash the *certiorari*. The motion was argued November 17th 1862. The court dissolved the injunction, and quashed the *certiorari:* vide report of Filley *v.* Ewing, post 384.